# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00428-CV

## In the Matter of F. H.

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. J-27,465, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This case involves the district court's adjudication that Appellant F. H., a minor, engaged in delinquent conduct by committing the offense of burglary of a habitation. On appeal, F. H. argues that the evidence is legally and factually insufficient to support the court's finding that F. H. committed or attempted to commit theft. We find that the evidence is legally insufficient to support the court's finding that F. H. committed or attempted to commit theft. We modify the judgment to show commission of the lesser-included offense of criminal trespass of a habitation, and we affirm the judgment as modified.

According to testimony at trial, on the afternoon of March 29, 2007, Mark Tran and his 70-year-old mother stopped by a house owned by his mother and recently deceased father to check on the status of the remodeling of the house. Noticing that the porch light had been turned off since his last visit, Tran suspected a break-in. There had been two recent break-ins on the property. In the first incident, someone broke into the shed behind the house, stealing some items and breaking other items. In the second incident, which occurred approximately one week before the events of

March 29, someone stole the stereo from Tran's father's car, which was parked inside the garage. According to Tran, it also appeared that someone had tried to steal a speaker and the car.

Upon entering the house on March 29, Tran observed that it had been damaged. The damage included a large hole in the living room wall, paint peeling off another wall in that room, a large hole in the back door, six broken windows, holes in the ceiling and a closet door, gang-related graffiti in the bedrooms, and evidence of fire in the master bedroom and master closet. None of this damage had existed the previous week, when Tran last visited the house.

After Tran entered the house but before he could observe the full extent of the damage, F. H. and another boy emerged from a back room. Tran had not given either individual permission to be inside the house. F. H. immediately stated, "I didn't do it." Tran testified that upon first encountering F. H., he did not see any items from the property in F. H.'s possession or in the other boy's possession. Tran told them to remain in the house with him as he called 911. Once Tran informed the 911 operator that his house had been broken into and that two individuals were in the house, the two boys fled. Tran chased them until he "got winded" and lost sight of them. A minute or two later, he caught sight of F. H. running down a street by himself and was able to catch up with him. When Tran caught up with F. H., as they were running F. H. said to him, "Well, I'll show you where my buddy is. Just follow me."

F. H. led Tran to a house, which Tran assumed was where F. H. lived, and went inside while Tran waited outside. Tran then saw two motorcycle police officers and flagged them down. The police officers entered the house but did not find F. H. After three or four more police officers arrived, including Officer Daymond Dunn who testified for the State during the adjudication hearing,

2

a woman who had been sitting in front of the house informed the police that F. H. was a friend of her son, and that F. H. was hiding inside the house. Although F. H. was not where the woman said he would be, Officer Dunn soon found him in an adjacent yard. F. H. obeyed the officer's command to come back into the woman's yard, and Officer Dunn took him into custody. Officer Dunn testified that his search of F. H. revealed nothing significant on his person.

Tran testified that "some items" were missing from his parents' house following the March 29 break-in. The following is Tran's initial testimony regarding missing property:

Q:     Did you find, Mr. Tran, after going through your home that things were missing?

A:     Inside the home we removed pretty much all the items and put them in the shed. So the majority of the items was in the shed. I mean, there was tools, rakes, shovels—was inside the house. So we were missing two of the rakes. Initially—I didn't think about it until my mother-in-law—she was cleaning up afterwards, and she noticed some items in the back of his house at that time.

Q:     In the back of whose house at that time?

A:     [F. H.]

Q:     So some items that were missing from your home, your mother saw?

A:     My mother-in-law.

Q:     Your mother-in-law saw. Did you see these items as well?

A:     Yes.

Q:     And they were in [F. H.]'s yard?

A:     Yes.

Q:     But you had already learned he was your neighbor?

3

A:      Yes.

Tran later provided the following testimony regarding missing property:

Q:      And you stated—correct me if I'm wrong, but earlier you stated that there were items that were previously outside the home, now inside the home?

A:      When we started the remodeling, we threw away a lot of stuff. And then the remaining stuff that my dad wanted to keep, at that time we kept in the shed. So all—most of his belongings was in the shed.

        And when the burglary happened the first time, they took a lot of items out of the shed. And when the burglary happened the third time, the police officer—my mother-in-law noticed there were some items in the back that belonged to us.

        And the police officer went over to the house, spoke with [F. H.]'s uncle. And [F. H.]'s uncle says, yeah, there's probably some items of theirs in the back of the yard. And at that time, the police officer told me, you know, could I come over here and identify.

Q:      And I'm sorry. Let me clarify my question. My question is—or let me ask you this way: Was there anything inside the home on the 29th of March that hadn't been there before, that you didn't recognize, or that you realized had been moved?

A:      There were two rakes that was inside the house.

Q:      That hadn't been there previously?

A:      Right.

Therefore, at the time of the March 29 break-in, most of Tran's father's possessions had been placed in the shed, and Tran identified the few items left in the house as "tools, rakes, shovels." Soon after the March 29 break-in and F. H.'s capture, Tran learned that F. H. lived next door to the property in question. Tran's mother-in-law noticed "some items" in F. H.'s backyard that

4

belonged to Tran's parents, Tran saw "these items" as well, and a police officer went to F. H.'s house and was informed by F. H.'s uncle that there probably were "some items" in the back of the yard that belonged to them.

The only items that Tran identified were two rakes, but the record is unclear what exactly happened with regard to the rakes. On one hand, given Tran's initial testimony that he and his mother-in-law saw items belonging to them in F. H.'s backyard while they were cleaning up after the March 29 incident and that this was when Tran realized he was "missing two of the rakes," it is possible that Tran misunderstood the State's later questioning regarding the rakes being found *inside* the house. If Tran's later testimony was the result of misunderstanding the questions, it appears that the two rakes were—or were among—the items seen in F. H.'s yard. On the other hand, given Tran's later testimony identifying the rakes as something "inside the home on the 29th of March that hadn't been there before," it is possible that the items seen in F. H.'s yard did not include the two rakes, but somehow caused Tran to realize that two rakes had re-appeared in his house as of the March 29 incident.

Tran also referred to a fourth incident at the house. About four days after the March 29 break-in, someone broke nine additional windows and apparently threw a burning piece of paper inside the master bedroom. According to Tran, this took place after F. H. was released on probation.

According to Tran, during the first week of May 2007, F. H. and two companions visited Tran and his wife. During that encounter, F. H. admitted responsibility for "the damages" but alleged that the other boy discovered in the house on March 29 was the "ringleader" who did the

5

majority of the damage.  F. H.'s two companions also informed Tran that the other boy was the ringleader.  F. H. apologized and said, "I don't want any more problems."

In its original petition, the State alleged that F. H. engaged in delinquent conduct by committing the offense of burglary of a habitation.  *See* Tex. Fam. Code Ann. § 51.03(a)(1) (West Supp. 2007) (defining "delinquent conduct" to include conduct that "violates a penal law of this state . . . punishable by imprisonment").  The State prosecuted F. H. under section 30.02(a)(3) of the penal code, which provides that a person commits burglary "if, without the effective consent of the owner, the person . . . enters a building or habitation and commits or attempts to commit a felony, theft, or an assault."  Tex. Penal Code Ann. § 30.02(a) (West 2003).  According to the State's petition, F. H. did "knowingly and intentionally enter a habitation without the effective consent of Mark Tran, the owner, and therein attempted to commit and committed theft" on or about March 29, 2007.  Following a bench trial on May 31 and June 7, 2007, the trial court found that F. H. committed the charged offense and adjudicated F. H. as delinquent.[1]

On appeal, F. H. asserts that the evidence is legally and factually insufficient to establish that F. H. committed theft or attempted to commit theft—an essential element of the charged offense of burglary of a habitation.  A person commits theft if he "unlawfully appropriates property with intent to deprive the owner of property."  *Id.* § 31.03(a) (West Supp. 2007).  A person attempts to commit theft if he, with specific intent to commit theft, "does an act amounting to more than mere preparation that tends but fails to effect the commission" of the theft.  *Id.* § 15.01(a) (West 2003).

---

[1]  The adjudication hearing was conducted by Associate Judge Leonard Ray Saenz.  Judge W. Jeanne Meurer signed the judgment of delinquency.

We review adjudications of delinquency in juvenile cases by applying the same standards applicable to sufficiency of the evidence challenges in criminal cases. *In re M.C.L.*, 110 S.W.3d 591, 594 (Tex. App.—Austin 2003, no pet.). In assessing the legal sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). Where the trial court's judgment is necessarily based on inferences from the evidence, we must determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *See id.* at 16-17.

The trial court's stated reasoning on the record for its finding that F. H. committed theft or attempted to commit theft was that because F. H. told Tran he would lead him to where the other boy had taken Tran's items, F. H. was responsible under the law of parties. Contrary to the trial court's recollection of the evidence, there is nothing in the record to indicate that F. H. referred to any of Tran's items when he told Tran to follow him. Considering all the evidence that *is* in the record regarding the other boy—his discovery in and flight from the damaged house, Tran observing nothing in his possession upon his discovery in the house, and F. H. identifying him as the "ringleader" responsible for most of the damage—we conclude that no rational trier of fact could have found beyond a reasonable doubt that the other boy committed or attempted to commit theft. We must determine, therefore, whether the evidence is legally sufficient to support the judgment for

7

any reason other than the law of parties.[2]  *See State v. Herndon*, 215 S.W.3d 901, 905 n.4 (Tex. Crim. App. 2007) ("[T]he general rule is that a trial court's ruling will be upheld if it is correct on any applicable legal theory, even if the court articulated an invalid basis.").

The State provided no evidence that F. H. had any connection to the two prior incidents of theft at the house.  Nor is there any evidence that, on March 29, F. H. had any stolen property in his possession either upon his discovery in the house, during his flight, or upon his capture by the police.  There is no evidence that any items which had been in the house on Tran's last visit had disappeared and remained unfound, and there is no evidence that any items inside the house both before and after the March 29 break-in had been touched or moved.

Further, none of F. H.'s actions following his discovery in the house raises a reasonable inference that he committed theft or attempted to commit theft.  *See Hooper*, 214 S.W.3d at 13 ("In reviewing the sufficiency of the evidence, we should look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985))).  Although the State argues that F. H.'s flight is circumstantial evidence of guilt, the State does not explain how the flight can be reasonably attributed to theft or attempted theft rather than to the observed trespass or the visible damage to the house.  *See Hodge v. State*, 506 S.W.2d 870, 873 (Tex. Crim. App. 1974) (op. on reh'g) ("If the defendant offers evidence that the . . . flight may have sprung from some other cause, but its

_____

[2]  The State conceded at oral argument that the conviction could not be supported on the theory that F. H. is guilty of burglary of a habitation under the law of parties.

connection to the offense on trial remains a logical one, the evidence [of flight] would still be admissible, the defensive evidence going only to the weight of evidence."). The fourth incident at the house, which Tran appeared to attribute to F. H. because it happened soon after F. H. was released, involved damage to the house but no evidence of a theft or an attempted theft. Likewise, neither of F. H.'s statements concerning his or the other boy's culpability—his denial upon discovery and his confession a week before trial—made any explicit connection to theft or attempted theft, or to any wrong committed other than "the damages" to the house.

The only other evidence the State argues demonstrates that F. H. on or about March 29 committed or attempted to commit theft—rather than, for instance, criminal trespass, criminal mischief, or arson—is Tran's testimony that "some items," which may or may not have included two rakes, were found in the backyard of F. H.'s house.[3] Because there is no evidence that any such items were removed from the house upon Tran's discovery of the boys in the house, we would need to infer from the testimony regarding the items either that, after removing those items during the preceding week, F. H. returned to the house on March 29 and attempted to commit theft of additional items, or that F. H. had removed the items from the house and re-entered the house immediately prior to Tran's arrival on March 29. To make either inference, we must first infer that F. H. stole the items found in his yard. However, there is no evidence that F. H. had anything to do with getting the items to his backyard. The yard abutted the Tran property, and there is no evidence

---

[3] In its brief, the State conceded that there is insufficient evidence to establish that F. H. committed theft based solely on the evidence relating to the items found in F. H.'s yard because "the State did not establish that appellant had sole access to the property" where the items were found, and thus focused on whether F. H. *attempted* to commit theft.

9

that F. H. alone had access to his backyard or the ability to throw the items over the fence into his backyard. Significantly, there is no evidence of when those items appeared in F. H.'s yard (Tran did not notice the items' disappearance until seeing them in the backyard). Thus, the items could have been stolen during the first or second incident of burglary of the Tran property, and the State offered no evidence that F. H. had any connection to either incident.[4] Nor was F. H. charged in connection with either incident. We conclude that, on this record, no rational trier of fact could have found the essential element of theft or attempted theft beyond a reasonable doubt.[5]

The evidence is legally insufficient to establish that F. H. committed the offense of burglary of a habitation.[6] The offense of criminal trespass is a lesser-included offense of burglary. *See Day v. State*, 532 S.W.2d 302, 306 (Tex. Crim. App. 1975). Both appellant and the State conceded at oral argument that reformation of the judgment to reflect an adjudication of delinquency for criminal trespass of a habitation would be proper. *See Collier v. State*, 999 S.W.2d

---

[4] The State both in its brief and at oral argument stated that Tran had moved most items from the house to the shed—other than the tools, rakes, and shovels—*after the second break-in*. This would strengthen the inference that if the two missing rakes were among the items in F. H.'s yard, they were taken in connection with the March 29 incident. However, Tran testified that his father's belongings were moved to the shed when they "started the remodeling," and that when his father's shed was broken into during the first incident, "we had all his belongings in there." Thus, Tran's testimony indicates that the items' removal to the shed, and the placement of the tools, rakes, and shovels inside the house, occurred prior to the first incident.

[5] We note that the trial court did not adjudicate F. H. delinquent based on any evidence of F. H.'s direct involvement with theft or attempted theft. The trial court's rationale for adjudicating F. H. delinquent was solely the court's mistaken impression that the record supported a finding based on the law of parties.

[6] Because we conclude that the evidence is legally insufficient to support the trial court's finding that F. H. committed or attempted to commit theft, we do not need to consider whether the evidence is factually sufficient to support the finding.

779, 782 (Tex. Crim. App. 1999) (setting forth the standards for reforming a judgment of conviction to reflect conviction of a lesser-included offense); *Garrett v. State*, 161 S.W.3d 664, 672 (Tex. App.—Fort Worth 2005, pet. ref'd) ("A court of appeals may modify the trial court's judgment to reflect guilt of a lesser-included offense and affirm it as modified."); *see also* Tex. Penal Code Ann. § 30.05(d) (West Supp. 2007) (making criminal trespass a Class A misdemeanor if committed in a habitation). Therefore, we modify the judgment to replace the finding that F. H. committed burglary of a habitation with a finding that he committed criminal trespass of a habitation, and we affirm the judgment as modified.

_____

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Modified and, as Modified, Affirmed

Filed: May 30, 2008